1  Chris Gardas
   Attorney at Law
2  530 43rd Street
   Richmond, CA 94805
3  Tel (415) 407-4918
   Fax:  (510) 778-1273
4  chrisgardas@comcast.net

5  Attorney for Plaintiffs
   Edgardo Michel and
6  Alis Salinas de Michel

7

8                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF CALIFORNIA**
9

10 EDGARDO MICHEL AND ALIS          )  Case No.  1:10-CV-02375-AWI-SKO
   SALINAS DE MICHEL,               )  (Removed from Stanislaus County Superior
11                                  )  Court, Case No. 659711)
              Plaintiffs,           )
12                                  )
        vs.                         )  WRONGFUL FORECLOSURE; TO
13                                  )  CANCEL THE TRUSTEE'S DEED UPON
                                    )  SALE; FRAUD IN THE FACTUM; TO
14 DEUTSCHE BANK TRUST COMPANY,     )  VOID THE PROMISSORY NOTE AND
   AS TRUSTEE FOR GSAA HOME         )  DEED OF TRUST; TO QUIET TITLE;
15 EQUITY TRUST 2006-2; SAXON       )  VIOLATION OF 15 U.S.C. §1641(g);
   MORTGAGE SERVICES, INC.;         )  VIOLATION OF RESPA (12 U.S.C. § 2605);
16 REGIONAL SERVICE CORPORATION;    )  AND UNFAIR BUSINESS PRACTICES
   ARGENT MORTGAGE COMPANY;         )  (Bus. & Prof. Code 17200 et seq.)
17 AND DOES 1 to 50, Inclusive,     )
                                    )
18            Defendants.           )       Unlimited Civil Jurisdiction
                                    )       JURY TRIAL DEMANDED

19

20 Plaintiffs EDGARDO MICHEL and ALIS SALINAS MICHEL hereby submit their First

21 Amended Complaint and aver as follows:

22

23                              PARTIES

24 1.      Plaintiffs EDGARDO MICHEL (Hereafter, "MICHEL") and ALIS SALINAS MICHEL

25 (Hereafter, "SALINAS"), or collectively "Plaintiffs" were at all times herein adult residents of

26 the State of California and the sole owners of certain real property in Stanislaus County

27 commonly known as 5025 Countryridge Lane, Salida, California, 95368, (Hereafter, the "Subject

28 Property"), and whose legal description is as follows:

---

FIRST AMENDED COMPLAINT                                    Page -1-

LOT 112, COUNTYSTONE 4, AS SHOWN ON MAP FILED IN
BOOK 3 OF MAPS PAGE(S) 20 IN THE OFFICE OF THE
COUNTY RECORDER OF STANISLAUS COUNTY.
A.P.N.:  136-006-004-000

2.     Plaintiffs are informed and believe, and thereon allege that Defendant DEUTSCHE
BANK TRUST COMPANY, AS TRUSTEE FOR GSAA HOME EQUITY TRUST 2006-2
(Hereafter, "DEUTSCHE"), business form unknown, is a provider of private securities services.
DEUTSCHE is presently listed as the "investor" on the Mortgage Electronic Registration System
and purportedly acted as trustee on behalf of investors in a named mortgage-backed
securitization ("MBS") sponsored by Goldman-Sachs.  However, because the MBS is
erroneously named on the Deed of Trust, it is impossible to determine which MBS purports to
hold the Subject Loan.

3.     Plaintiff is informed and believes, and thereon alleges that Defendant SAXON
MORTGAGE SERVICES, INC. (Hereafter, "SAXON"), is a licensed California corporation
which does business as a servicer of residential mortgage loans payments, and acted as servicer
of the loan for the Subject Property.  SAXON has purported to be the beneficiary under the Deed
of Trust.

4.     Plaintiffs are informed and believe, and thereon allege that Defendant REGIONAL
SERVICE CORPORATION, (Hereafter "RSC"), organized under the state of Washington, is a
licensed California Corporation in the business of acting as a non-judicial foreclosure trustee.
REGIONAL is purportedly acting as a duly substituted trustee in conducting the foreclosure sale
of the Subject Property.

5.     Plaintiffs are informed and believe, and thereon allege that Defendant ARGENT
MORTGAGE COMPANY (Hereafter, "ARGENT") is a licensed California corporation,
formerly a warehouse lender of subprime residential mortgage loans and originator of the
Subject Loan.

6.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES
1 - 50 Inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will
amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is

1   informed and believe and based thereon allege each of the fictitiously named defendants is

2   responsible in some manner for the injuries to Plaintiff alleged herein, and that such injuries as

3   herein alleged were proximately caused by such defendants.

4   7.      Plaintiff is informed and believe and thereon alleges that at all times herein mentioned,

5   that each of the defendants were the agents, employees, partners, joint venturers, co-conspirators,

6   successors or predecessors in interest, owners, principals, and employers of the remaining

7   defendants, and in doing the things hereinafter alleged, were acting within the course and scope

8   of such agency, partnership, employment, ownership, joint venture and/or conspiracy.  Plaintiff

9   is further informed and believes and based thereon alleges that the acts and conduct herein

10  alleged of each such Defendant were known to, authorized by, and/or ratified by the other

11  Defendants, and each of them.

12  8.      Whenever in this Complaint an act or omission of a corporation or business entity is

13  alleged, said allegation shall be deemed to mean and include an allegation that the corporation or

14  business entity acted or omitted to act through its authorized officers, directors, agents, servants,

15  and/or employees, acting within the course and scope of their duties, that the act or omission was

16  authorized by corporate managerial officers or directors, and that the act or omission was ratified

17  by the officers and directors of the corporation.

18

19                             FACTUAL ALLEGATIONS

20

21  9.      In or about July of 2005, Plaintiffs responded to a radio advertisement by MI TIERRA

22  MORTGAGE AND REAL ESTATE INC., (Hereafter, "TIERRA"), targeting the local Spanish-

23  speaking community.  Part of an extensive marketing campaign, TIERRA broadcast regular bi-

24  weekly thirty-minute spots that discussed various issues in the areas of real estate and debt

25  consolidation.  Claiming to "work exclusively for the Spanish community," TIERRA promised

26  to assist homebuyers take advantage of historically low interests rates and the booming real

27  estate market.

28  10.     All discussions with TIERRA and its employees and agents were conducted in Spanish,

the couple's primary language.  At the time of these interactions, MICHEL spoke limited English and SALINAS could read and write only in Spanish.

11.     Plaintiffs initially approached TIERRA to sell their residential property in Tracy, California.   Plaintiffs stated that they wanted to reinvest the proceeds from the sale to acquire the Subject Property.

12.     TIERRA advised Plaintiffs to apply for a purchase loan at the same time the Tracy property was put on the market.   RUBY HARO, (Hereafter, "HARO"), a real estate salesperson from TIERRA, was assigned to their case.  HARO assured Plaintiffs that they were well-qualified for the house of their dreams, and that TIERRA could procure a "great" loan with a low interest rate that would result in very affordable monthly payments.

13.     Plaintiff submitted a loan application to TIERRA.  Plaintiffs gave true and accurate financial information to HARO in support of their loan application.  HARO was aware that SALINAS was not employed at the time and advised MICHEL that he did not need to provide W2's or tax returns.

14.     Plaintiffs insisted that they would not consider a loan with a variable interest rate.  HARO informed Plaintiffs that because everyone sells or refinances within three years, a 30-year fixed rate interest loan no longer existed.  However, HARO assured Plaintiffs that the interest rate on their loan would be fixed for three years.  After the three years, HARO would contact Plaintiffs and simply refinance the loan.

15.      Plaintiffs also insisted that they wanted to use the proceeds of the Tracy sale as a down payment on the Subject Loan.   HARO strongly discouraged putting any money down, and convinced Plaintiffs that a $100,000 down payment would make very little difference in the amount of their payments.

16.     HARO told Plaintiffs that the $450,000 purchase of the Subject Property would be funded with two loans from ARGENT, a senior loan in the amount of $360,000 and a "piggyback" loan in the amount of $90,000.  HARO stated that the monthly payments would be $1,500.00 per month, inclusive of taxes and insurance.  Closing costs in excess of $5000.00 were rolled into the loan.

FIRST AMENDED COMPLAINT                                                      Page -4-

17.     Plaintiffs were not provided copies of initial disclosures required under California Law and the Truth In Lending Act ("TILA"), including a Mortgage Loan Origination Agreement, Good Faith Estimate, or TILA disclosures.

18.     On a Sunday on or about August 7, 2005, Plaintiffs attended the loan closing at TIERRA's office and were surprised to find that only FRANCISCO SARABIA, a notary public was present, because HARO had stated that she would be present.

19.     Although SARABIA spoke Spanish, he stated that he was only present to show Plaintiffs where to sign and to witness their signatures, and could not answer any questions.

20.     Plaintiffs understood that they were signing "closing documents," but SARABIA did not inform Plaintiffs of the title, type, or nature of the individual documents.  Plaintiffs signed the closing documents where SARABIA indicated, relying on the representations of TIERRA and HARO as to the terms and content of the documents.  Plaintiffs were not given copies of any of the documents that they had signed.

21.     After execution of all documents was completed, an apparent typographical error was discovered in certain documents in which the middle initial for SALINAS was incorrect. SARABIA stated that the paperwork would have to be redone, and instructed Plaintiffs to return to the office on the following Sunday to close the transaction.

22.     On or about August 14, 2005, Plaintiffs repeated the closing, again signing where indicated without explanation from SARABIA.

23.     On information and belief, Plaintiff signed a promissory note in the amount of $360,000.00.   Plaintiffs signed a Deed of Trust as security for the Subject Loan in favor of ARGENT as lender, with Town and Country Title Services, Inc. as trustee.   The Deed of Trust ("DOT") states that it is second and subordinate to the security interest for the $90,000 ARGENT loan.  The Deed of Trust was recorded on August 24, 2005 in the Stanislaus County Recorder's Office.  A true and correct copy of the Deed of Trust is attached as Exhibit "A," and incorporated herein by reference.

24.      The acknowledgement states that Plaintiffs personally appeared before SARABIA on December 8, 2005.  Plaintiffs only met with SARABIA on the two consecutive Sundays in

August.  Even if the date on the acknowledgement was due an error in transposing the month and day, Plaintiffs did not appear before SARABIA on August 12, 2005, which was a Friday.

25.     No translation of the documents from either "closing" was ever provided and Plaintiffs relied on the representations of TIERRA as to the terms of the loan.

26.     Plaintiff was unaware at the time of the loan closing, and did not discover until later, that TIERRA has misrepresented the terms of the Subject Loan.  Misrepresentations by HARO included:

    A.  The monthly obligation on the first mortgage of $1575.00 represented interest-only payments, exclusive of taxes and insurance; an additional $733.00 was owed on the second mortgage.

    B.  The initial interest rate of 5.25% was fixed for the first three years, with an adjustable interest rate for the remainder of the 30-year term, adjusted every six months, with a floor of 5.25% and ceiling of 11.25%.

    C.   Total payments at the initial interest-only rate were $2,890.15; fully amortized payments totaled $3,303.08.

27.     Plaintiffs are informed and believe, and thereon allege that the Subject Loan was purportedly processed using full income and asset documentation.  In addition to misrepresentations by TIERRA as to the true loan terms, Plaintiffs also recently discovered that material information on their loan application was falsified by TIERRA and/or ARGENT.

28.     In particular, although SALINAS was unemployed at the time, the application lists her employer as JCP Enterprises in Fresno, California, with a monthly gross income of $6236.02.

29.      Plaintiffs are informed and believe, and thereon allege that JCP Enterprises is a completely fabricated business and that no such entity existed.  Further, because SALINAS was the primary borrower, falsification of her proof of income such as fraudulent W2's and tax returns must have been submitted to support criteria for full documentation.  Any falsification of the loan application and supporting documents were done without the knowledge of Plaintiffs.

30.     The falsified total gross monthly income of $9,752.02 as listed on the loan application represented a debt to income ratio of 33.87% at the fully amortized rate.

---

FIRST AMENDED COMPLAINT                                                   Page -6-

31.    However, based on the MICHEL's actual income of $4,516.00, the debt to income ratio for housing costs alone is 73.14%.  After factoring in MICHEL's other debts, including significant child support obligations, even the "teaser" interest-only payments exceeded the couple's total monthly income.

32.    After discovering that property taxes and insurance were not included in the monthly payments, MICHEL contacted TIERRA.  HARO convinced MICHEL that he had misunderstood that the escrow under the preliminary loan offer had been excluded loan eventually obtained.

33.    Due to their negative residual income, Plaintiffs necessarily had to, and did resort to, use the proceeds of the anticipated proceeds of the Tracy property to meet their loan payments and pay monthly living expenses.   Plaintiffs were not aware of this fact, and were misled by TIERRA into believing otherwise.

34.    Plaintiff are informed and believe, and thereon allege that HARO, while professing to be acting as fiduciary agent for Plaintiffs, were in reality contractually acting as an agent for, and/or in joint enterprise with, Defendant ARGENT.  Plaintiff was unaware of the agency relationship between Defendants HARO and ARGENT at the time the loans were procured, and neither HARO nor ARGENT disclosed the agency relationship to Plaintiff.

35.    Plaintiffs are informed and believe, based on industry-wide practices, that ARGENT conducted the actual underwriting of the Subject Loan, and during the application process one or more employees of ARGENT colluded with the mortgage broker by providing HARO with the specific income, assets, mitigating factors and/or other criteria necessary for approval of ARGENT'S payment option ARM loan.  Further, that ARGENT provided HARO with the eligibility minimums with the knowledge and anticipation that the broker and/or ARGENT itself would doctor Plaintiff's loan application to conform to underwriting guidelines.

36.    On August 23, 2005, one day prior to recordation of the Deed of Trust, a Corporate Assignment of Deed of Trust was executed by ARGENT, purportedly conveying all beneficial interest to "Deutsche Bank Trust Company Americas, formerly known as Banker's Trust Company, as Trustee and Custodian for GSAA 2006-2 by Saxon Mortgage Services, Inc., f/k/a Meritech Mortgage Services, Inc. as its attorney in fact."   A true and correct copy of the

Assignment is attached as Exhibit "B," and incorporated herein by reference.

37.      Plaintiffs are informed and believe, and thereon allege that this Assignment was executed in blank, based on the following:

    A.   The instrument number and recording date for the Deed of Trust is handwritten on the Corporation Assignment, even though this information is not available on the date the Assignment is purportedly executed by ARGENT.

    B.   The name of the GSAA Trust was inserted with a hand stamp.

38.      Plaintiffs further allege based on information and belief that a GSAA 2006-2 trust, (Hereafter, "GSAA"), has never existed and no such trust is registered with the Securities and Exchange Commission. ("SEC")  The purported assignment to a non-existent entity is a legal nullity.

39.      The Corporate Assignment was not recorded until June 15, 2007.

40.      Based on the foregoing, Plaintiff alleges that the Trust Administrators failed to properly document the transfer to the Trust as legally required.   To cover the malfeasance on the part of trust administrators, SAXON and DEUTSCHE knowingly recorded the defective Corporate Assignment from ARGENT to ostensibly establish authority to facilitate foreclosure of the Subject Property.

41.      Following origination, SAXON purportedly serviced the Subject Loan, as a sub-servicer under the PSA.

42.      From the time of origination, Plaintiffs struggled to make their monthly payments, even during periods when SALINAS was employed, and they relied heavily on their savings from the proceeds of the sale of the Tracy property.

43.      In or about May of 2007, Plaintiffs had nearly exhausted their savings and were concerned about their continuing ability to meet their loan obligation.  Plaintiffs refinanced the second mortgage through Bank of America, and received cash-out proceeds of approximately $20,000 from the "equity" in the Subject Property.

44.      Plaintiffs hoped to use the refinance proceeds to start a carpet cleaning business to be operated primarily by SALINAS in the hopes of generating additional income to meet their

expenses.  However, the business did not materialize and Plaintiffs instead used the funds to keep current on their mortgage payments.

45.     In or about July of 2008, the interest-only period expired and the ARM adjusted, resulting in an increase of approximately $1000.00 to the monthly payment.  At this point, Plaintiffs discovered the extent of the fraud and misrepresentations regarding the true terms of the Subject Loan.  Shortly afterward, damages began to accrue because Plaintiffs were unable to obtain refinancing, especially having depleted their savings, and Plaintiffs found themselves stuck with the ARM loan.

46.     Plaintiffs were unable to make their full mortgage payment.   MICHEL promptly contacted SAXON, explained the financial hardship, and requested assistance.   On or about August 12, 2008, SAXON responded by sending a Financial Worksheet to be completed to be considered for loss mitigation.

47.     After returning the completed loss mitigation application, SAXON instructed Plaintiffs not to make any payments until the paperwork was completed.  Plaintiffs responded promptly to SAXON's requests for further documentation.

48.     On December 18, 2008, a Notice of Default was recorded, with alleged arrears of $14,316.03.   The Notice did not contain the declaration required under CA Civ. Code §2923.5, and failed to identify the beneficiary.

49.     On January 6, 2009, a Substitution of Trustee was executed by SAXON, purporting to be the present beneficiary under the Deed of Trust, and naming REGIONAL SERVICE CORPORATION (Hereafter, "RSC"), as the new trustee.   However, at the time of its execution, DEUTSCHE was the beneficiary of record, and DEUTSCHE did not assign its interests in the Note or Deed of Trust until January 23, 2009.   Because SAXON had no authority to name a new trustee, the Substitution is defective and RSC was not authorized to conduct a foreclosure sale. A true and correct copy of the Substitution is attached as Exhibit "C," and incorporated herein by reference.

50.     The Substitution was executed by CHRISTINA ALLEN, purportedly an Assistant Vice President for SAXON.

51.     Plaintiffs are informed and believe, and thereon allege that CHRISTINA ALLEN is not an officer of SAXON, but is an employee of Lender Processing Services, Inc. ("LPS").  LPS, a "foreclosure technology provider," is one of the foreclosure mill "fraud factories" under investigations throughout the county for allegedly creating forged, incorrectly and illegally executed, false and misleading documents to accelerate foreclosures.  The Substitution was recorded on March 24, 2009.

52.     On January 23, 2009, an Assignment of Deed of Trust was executed by SAXON as Agent for DEUTSCHE, purporting to transfer all beneficial interest in Note and Deed of Trust to SAXON.   The Assignment was recorded on January 28, 2009.  A true and correct copy of the Assignment is attached as Exhibit "D," and incorporated herein by reference.

53.     The document was executed by TOPAKO LOVE, as a purported Assistant Vice President of SAXON.

54.     Plaintiffs are informed and believe, and thereon allege that TOPAKO LOVE is not an officer of SAXON, but is also an employee of LPS.

55.     Plaintiffs are further informed and believe, and thereon allege that although SAXON may have been authorized to act as attorney in fact for DEUTSCHE, the Master Agreements for the GSAA Trust prohibited the purported conveyance to SAXON.

56.     On March 24, 2009, a Notice of Trustee Sale was recorded, with a scheduled sale date of April 9, 2009.  The sale was postponed several times while the loan modification process was pending.

57.     Plaintiffs are informed and believe, and thereon allege that SAXON entered into a Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008 and agreed to perform certain loan modification and foreclosure prevention services for eligible loans.

58.     Each of the numerous times that MICHEL contacted SAXON by phone over the course of the next sixteen months, MICHEL requested to speak with a Spanish-speaking customer service representative.   Plaintiff was typically placed on hold, only to find the call disconnected

1   after waiting for long periods of time.  Other times, the SAXON customer service representative

2   would simply hang up in response to MICHEL's request.

3   59.   On or about June 10, 2009, nearly a year after submitting the application, Plaintiffs

4   received an offer from SAXON for a trial modification under the federal Making Home

5   Affordable Program ("HAMP").  Despite MICHEL's repeated requests for SAXON to provide

6   documents in Spanish, the offer was in English.  The trial plan consisted of three payments of

7   $1,700.74 for the months of July, August and September of 2009.  After completion of the trial

8   period, Plaintiffs loan was to be permanently modified.   Plaintiffs signed and returned the Trial

9   HAMP Agreement, but were never provided a copy executed by SAXON or DEUTSCHE.

10   60.   Plaintiffs made the payments as called for in the contract.  In or about late September of

11   2009, MICHEL contacted SAXON to inquire about the permanent modification.  For the first

12   and only time, MICHEL reached a representative that spoke Spanish, albeit with limited

13   proficiency.

14   61.   The SAXON agent told MICHEL that he needed to continue to make the trial payments

15   until processing of the paperwork was completed.  MICHEL expressed concern that the trial

16   payments were not affordable.  Plaintiffs were only able to make the monthly payment by using

17   money that had been saved during the period when they were told not to make mortgage

18   payments.

19   62.   The SAXON representative told MICHEL that he did not have to worry because the

20   computer system showed that his payments under the terms of the permanent modification would

21   lower than under the trial plan, decreasing to $1400.00 per month.  Plaintiff was also informed

22   that he was now required to make trial payments through Western Union.

23   63.   Plaintiff made three more "trial" payments in October, November and December of 2009,

24   believing that the $1,400.00 payments under the permanent modification would be affordable.

25   64.   In or about December 2009, Plaintiffs received a permanent HAMP modification offer

26   from SAXON by mail.  Contrary to Saxon's previous representations, the HAMP payments

27   increased under the proposed permanent plan, to $1,829.87.  Even more troublesome for

28   Plaintiffs, the payments would increase significantly according to a graduated interest rate

period, ultimately increasing to $2,454.05 from the ninth year onward.  Believing the loan payments to be far beyond their means, Plaintiffs declined the permanent modification offer.

65.     On February 10, 2010, MICHEL filed a Chapter 7 Bankruptcy petition, in an attempt to eliminate unsecured debt and have more money available for mortgage payments.

66.     On April 21, 2010, RSC recorded a Rescission of the Notice of Default.  Plaintiffs were not provided with a copy of the Rescission Notice.

67.     On June 3, 2010, an Assignment of Deed of Trust was executed by SAXON, purporting to transfer all beneficial interest in the Promissory Note and Deed to Trust to DEUTSCHE Bank Trust Co. as Trustee for GSAA Home Equity Trust 2006-2.  Plaintiffs were not provided with a copy of the Assignment, nor were they otherwise informed of the purported change in ownership.

68.      The Goldman Sachs trust administered by DEUTSCHE "GSAA Home Equity Trust 2006-2" (Hereafter, "GSAA Trust") is an actual entity registered with the SEC.  The Pooling and Servicing Agreement ("PSA") is available online at:

**http://www.sec.gov/Archives/edgar/data/807641/000090514806001043/efc6-0400_fwp.txt**

69.     Plaintiffs are informed and believe, and thereon allege that the purported Assignment was fabricated to clear title prior to foreclosure, and that no such conveyance occurred.  The ostensible transfers between DEUTCHE and SAXON were an ineffective attempt to transfer legal title from the non-existent GSAA 1 to the legitimate GSAA 2 trust.  Because DEUTSCHE and SAXON did not simply record a corrective assignment further evinces that the GSAA Trust Assignment was not merely a typographical error.

70.     In addition, the purported Assignment is contrary to the strict requirements for conveyance of the pool of loans to the GSAA Home Equity Trust, as set forth in Section 2.01 of the PSA, in several respects including:

        A.  The closing date for the GSAA Trust is February 6, 2006, beyond which the Trustee has no legal authority to accept conveyances of loans.  The purported Assignment, evincing a present intent to transfer the Note and Deed of Trust, is more than four years outside the closing date.

---

FIRST AMENDED COMPLAINT                                    Page -12-

B.  The Depositor, GS MORTGAGE SECURITIES CORP, ("GSMSC"), is the only entity authorized to convey the pool of loans to the GSAA Trust.  According to sworn statements filed with the SEC, GSMSC transferred the loans and executed the assignments to DEUTSCHE as Trustee.  Neither ARGENT nor SAXON had authority to convey directly to the GSAA Trust, and DEUTSCHE acted ultra vires to the explicit powers granted in the Master Trust Agreement by accepting such an assignment.

C.  The GSAA Trust was prohibited from accepting loans in default, and acceptance of the Subject Loan as described in the Assignment would violate IRS rules for REMIC trusts.

71.   On or about June 4, 2010, Plaintiffs' authorized agent sent a Qualified Written Request ("QWR") to SAXON.  The response from SAXON did not comply with the requirements of the Real Estate Procedures Act, including, inter alia, SAXON's failure to address Plaintiffs' request to identify the current holder of the Subject Loan, to provide a accounting throughout the life of the loan, or to produce copies of collection notices and other communications related to the servicing of the loan.

72.   On June 6, 2010, a second Notice of Default was recorded.  The Notice was executed by LPS DEFAULT TITLE AND CLOSING, as agent for RSC.

73.   Plaintiffs received a letter from SAXON's Home Preservation Department, dated July 20, 2010.  The letter informed Plaintiffs that they had until August 4, 2010, to return the signed and notarized HAMP modification agreement.  Plaintiffs were further advised that failure to respond within the time frame would result in ineligibility for future HAMP assistance.

74.   Plaintiff, through their authorized representative, contacted SAXON prior to the stated deadline.  Plaintiffs are informed and believe, and thereon allege, that their agent explained to SAXON that a mistake had been made in calculating the Plaintiffs' income, likely due to the language barrier.  Specifically, MICHEL's monthly child support obligation of approximately $1200 per month was erroneously counted as additional income.  The inflated income resulted in

payments beyond the Plaintiffs' financial means.

75.     Plaintiffs allege on information and belief that their agent submitted an application for Saxon's in-house modification program.  Plaintiffs were denied eligibility based on insufficient income and excessive debt to income ratio.

76.     Plaintiffs are informed and believe, and thereon allege that SAXON closed the HAMP modification file prior to the stated deadline.  Plaintiff's agent's submitted a request to SAXON Customer Relations Department to reopen the file due to the miscalculation of income.  Neither Plaintiffs nor their agent received a response, but were subsequently told by a SAXON representative that Plaintiffs did not make payments under the trial modification and were therefore not eligible for a permanent HAMP modification.  Plaintiffs' agent submitted another request to reopen the HAMP application, and attached proof that all payments had been remitted as required and a copy of the permanent modification offer.   Plaintiff's agent later learned from SAXON customer service that the second request had been summarily rejected, on the grounds that Plaintiffs had failed to make their payments under the trial plan.  Although SAXON indicated that a written determination would be sent from the Customer Relations Department, neither Plaintiffs nor their agent received a written explanation for the denial.

77.     Plaintiffs are informed and believe, and thereon allege that they do meet the Net Present Value under the HAMP guidelines and that a modification of the loan would result in a higher yield to investors.

78.     Plaintiffs further allege that Defendants had no intention of offering Plaintiffs a permanent loan modification according to the specified terms, but induced Plaintiffs to make trial modification payments with false promises of lower monthly payments upon completion of the trial period.  The lack of intent on the part of Defendants is further evidenced by SAXON's false reason for refusing to reopen the HAMP application and to determine eligibility using correct financial information.

79.     A second Notice of Trustee Sale was recorded on September 7, 2010.  The scheduled sale date of September 28, 2010 was postponed while the loan modification application was pending.

80.     On or about October 28, 2010, Plaintiffs agent contacted RSC and demanded that the

foreclosure sale not go forward due to the defective Substitution of Trustee and the illegality of documents executed in the foreclosure process by LOVE and ALLEN containing false assertions as to their corporate identity and authority to execute documents relevant to the Subject Loan.

81.     On October 28, 2010, after postponing the trustee sale for two hours, and after all prospective bidders had left the auction, the Subject Property was foreclosed with DEUTSCHE purportedly acquiring the property with a credit bid.

<u>FIRST CAUSE OF ACTION</u>

**WRONGFUL FORECLOSURE**

(Against Defendants SAXON, DEUTSCHE and RSC)

82.     Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

83.     Material non-compliance with California statutes governing non-judicial foreclosure procedures rendered the purported trustee sale illegal and void.

84.     The purported Assignment from ARGENT to the GSAA Trust is a legal nullity since no such trust has ever existed, and therefore lacked the capacity to hold and receive title in its name. Other essential elements of a valid deed, including delivery and acceptance by the grantee, could not be met as a matter of law by DEUTSCHE, acting as trustee on behalf of investors in a non-existent trust, resulting in a completely void and ineffectual transfer of title.

85.     The Substitution of Trustee was also defective because SAXON was not the beneficiary under the Deed of Trust when the Substitution was executed.  Therefore, RSC was not duly substituted under Cal. Civ. Code § 2934a and lacked authority to conduct the trustee's sale. Consistent with statutory procedure, Paragraph 24 of the Deed of Trust empowers only the Lender to appoint a successor trustee.

86.     More importantly, the purported Substitution of Trustee was tainted by fraud.  In executing the document, LPS employee CHRISTINA ALLEN falsely stated that she was a Vice President of SAXON.  Irrespective of any purported authority to act as an agent on behalf of

SAXON, this material misrepresentation of ALLEN's corporate identity and authority renders the Substitution void, and its recordation a criminal act.

87.    The Assignment of the Deed of Trust from the GSAA trust to SAXON was a legal nullity and did not effectuate a transfer.  First, DEUTSCHE, as trustee for the non-existent GSAA Trust lacked capacity to convey title.  Second, the Promissory Note necessarily remained with DEUTSCHE, as required under SEC and IRS laws governing mortgage-backed securities.  This attempt to transfer the Deed of Trust to SAXON without the Promissory Note is void under California Law.

88.    The Assignment of Deed of Trust from SAXON to the GSAAHE trust was a void transfer.  As discussed above, the Assignment violated the requirements for conveyance to the GSAAHE Trust, including that it occurred more than four years after the closing date; was not executed by the Depositor, the only entity authorized to convey to the Trust; and the Subject Loan was ineligible because it was in default at the time of the purported conveyance.

89.    The convoluted series of transfers were an effort to clear title to the Subject Property to facilitate foreclosure.  The real Assignment of the Deed of Trust to the GSAAHE Trust, required to be held by DEUTSCHE as the Custodian, would contradict the fabricated facts as stated in all assignments since origination of the Subject Loan.

90.    In addition, the reliance of "robo-signers" to facilitate default management has resulted in the public records being littered with numerous inexcusable typographical errors.

91.    Material and egregious disregard for statutory requirements governing non-judicial foreclosure procedures clearly establish that the foreclosure of the Subject Property was defective, wrongful, unlawful and void.

92.    As the result of the Defendants' noncompliance with the statutory requirements of Civil Code 2924 et seq. Plaintiff has suffered damages, including loss of their home to foreclosure and emotional distress.

93.    The wrongful conduct of Defendants deprived Plaintiffs of property and legal rights and otherwise caused injury.  Said acts constitute malicious, despicable conduct that subjected Plaintiff to unjust hardship in conscious disregard of his rights sufficient as to justify an award of

exemplary and punitive damages.

SECOND CAUSE OF ACTION

**TO CANCEL THE TRUSTEE'S DEED UPON SALE**

(Against Defendants SAXON, DEUTSCHE and RSC)

94.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

95.    As set forth above, because SAXON was not the beneficiary of record when the Substitution of Trustee was executed, RSC was not duly substituted, and the purported Trustee's Sale by RSC was illegal and void.

96.    More importantly, the purported Substitution of Trustee was tainted by fraud.  In executing documents to facilitate foreclosure of the Subject Property, LOVE and ALLEN falsely stated their corporate capacity as Vice Presidents of SAXON.  Irrespective of any purported authority to act as an agent on behalf of SAXON, this material misrepresentation of corporate identity and authority renders the Substitution void, and its recordation a criminal act.

97.    Plaintiffs are therefore entitled to, and seek an Order to Cancel the Trustee's Deed Upon Sale.

THIRD CAUSE OF ACTION

**FRAUD IN THE FACTUM**

(Against Defendants DEUTSCHE, SAXON, and ARGENT and DOES 1-50)

98.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

99.    TIERRA, its employees and agents, committed the acts of fraud complained of herein as an agent of, and/or working in concert with, ARGENT.

100.   As set forth above, HARO made representations about essential terms of the Subject

Loan including, without limitation, that total amount of monthly payments would be $1,500.00, that the payments included taxes and insurance, and that the initial payments covered principle and interest.

101.    The representations made by HARO were in fact false.  The true facts were that the monthly payment was based on the interest-only period, did not include taxes and insurance, and would increase substantially after three years.

102.     The misrepresentations were designed to induce Plaintiffs to enter into an unconscionable contract for the sole benefit of Defendants, who profited from the consummation and subsequent sale of the loan.

103.    TIERRA and HARO caused Plaintiffs to sign loan documents, promissory notes and deeds of trust, containing materially different terms than what had been orally represented to Plaintiffs in their native language, knowing that Plaintiffs could not read the documents written in English to discover the fraud.

104.    Plaintiffs believed and reasonable relied on HARO as their mortgage broker, who owed a fiduciary duty to Plaintiffs, to act in their best interests and to accurately and truthfully convey the terms of the contract.  Further, Plaintiffs inability to read English prevented them from discovering the fraud and learning the true terms of the loan.

105.    Had Plaintiffs known the essential terms of the loan, they would not have agreed to enter into the loan transactions or signed the loan documents that contained terms impossible for Plaintiffs to perform and destined to result in default and cause financial ruin.

106.    Because Plaintiffs lacked the ability to understand the essential terms of the loan, the misrepresentations prevented formation of a valid and enforceable contract.  Plaintiffs therefore seek to void the loan instruments, and for reformation of the loan in accordance with the terms as orally represented to Plaintiffs.

107.    Plaintiffs did not discover the full extent of the fraud and misrepresentations until in or about July of 2008, when the interest-only period expired and monthly payments increased by $1000.   At this point, Plaintiffs tried to obtain refinancing, but were unable, especially since they had depleted their savings to maintain the loan obligation.   Damages accrued because when they

were unable to obtain refinancing.

108.    Plaintiffs further relied on SAXON's misrepresentations of good faith negotiations to evaluate Plaintiffs for a loan modification.  Plaintiffs made a total of six monthly payments under what was supposed to be a three-month trial period under HAMP, only to discover that SAXON's promises of a permanent loan modification with affordable payments of $1,400.00 was false and deceptive.   Initial payments under the HAMP offer were actually over $1,800.00, and would eventually increase to nearly $2,500.00.

109.    As a proximate result of Plaintiff's reasonable reliance on Defendants' misrepresentations and nondisclosures, Plaintiff sustained damages including the loss of their savings, damages to their credit rate, and emotional distress, in an amount not yet ascertained to be proven at trial.

110.    The fraud, deceit and concealment deprived Plaintiffs of property and legal rights and otherwise caused injury.  Said acts constitute malicious, despicable conduct that subjected Plaintiff to unjust hardship in conscious disregard of his rights sufficient as to justify an award of exemplary and punitive damages.

111.    Wherefore, Plaintiff prays for judgment against Defendant as set forth herein.


<u>FOURTH CAUSE OF ACTION</u>

**TO VOID THE PROMISSORY NOTE AND DEED OF TRUST**

(Against Defendants DEUTSCHE, SAXON and ARGENT and DOES 1-50)


112.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

113.    As set forth above, the Promissory Note and Deed of Trust were the result of fraud in the factum on the part of HARO, TIERRA and one or more DOES.  The fraud resulted in a contract that was unconscionable with terms that were impossible for Plaintiffs to perform.

114.    Plaintiffs therefore seek to cancel the loan documents and for the Court to exercise its equitable powers to reform the contract terms to mitigate the significant damages caused to Plaintiffs.

FIFTH CAUSE OF ACTION

**TO QUIET TITLE**

(Against All Defendants and DOES 1-50)

115.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

116.    Plaintiff seeks to quiet title against the claims of Defendants: DEUTSCHE, the purported beneficiary under the Trustee's Deed Upon Sale; SAXON, the purported servicer who has claimed ownership rights during the foreclosure process; RSC, the purported substituted trustee under the Deed of Trust; and DOES 1 to 50, Inclusive.  Defendants claims are without right, and Defendants have no such right, title, estate, lien or interest in the Subject Property.

117.    Plaintiff names as Defendants in this action all persons unknown claiming (a) any legal or equitable right, title, estate, lien, or interest in the Property adverse to Plaintiff's title, or (b) any cloud on Plaintiffs' title to the Property.  The claims of each unknown defendant are without any right, and these defendants have no right, title, estate, lien or interest in the Property.

118.    An actual controversy exists between Plaintiffs and Defendants concerning their respective rights and duties pertaining to the Subject Property and the described transactions in that Plaintiffs contend that RSC was not duly substituted as trustee because SAXON was not the beneficiary of record and had no power under the Deed of Trust to make the substitution; furthermore that the purported Substitution is void due to fraud because it was executed by an individual falsely claiming to be a corporate officer of SAXON.  An actual controversy also exists as the validity of the Deed of Trust and the underlying Promissory Note in that Plaintiffs contend that the documents are void due to fraud in the factum.

119.    Defendants, however, contend that the Deed of Trust and Promissory Note are valid, that RSC was duly substituted as trustee with authority to conduct the foreclosure sale, and that DEUTSCHE obtained title to the Subject Property pursuant to Trustee's Deed Upon Sale.

120.    Plaintiff desires and is entitled to a judicial declaration quieting title in Plaintiff as of the date of this Complaint and establishing Plaintiffs' ownership and possessory interests in the Subject Property, subject only to this Court's determination of those interests Defendants may have in a reinstated Deed of Trust and Promissory Note.

SIXTH CAUSE OF ACTION

**VIOLATION OF 15 U.S.C. §1641(g)**

(Against Defendant DEUTSCHE)

121.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

122.    Section 404 of the "Helping Families Save Their Homes Act of 2009" amended the federal Truth-in-Lending Act ("TILA") to require that a new owner or assignee of a residential mortgage notify a borrower of the sale or transfer of the loan and provide the name and contact information of a new owner no later than 30 days after the date on which a mortgage loan is sold or otherwise transferred to a third party, new owner or assignee.  15 U.S.C. §1641(g).   This new disclosure requirement became effective on May 20, 2009.

123.    A Corporate Assignment of Deed of Trust, executed on June 3, 2010, purportedly transferred all beneficial interest in the Deed of Trust and Promissory Note from SAXON to DEUTSCHE.  Plaintiff was not notified of the Assignment which was recorded on September 7, 2010.

124.    Defendant DEUTSCHE failed to disclose the change of ownership and did not provide the information required under 15 U.S.C. §1641(g) within the 30-day time period.

125.    As a result of Defendant's violation of 15 U.S.C. §1641(g), Plaintiff is entitled to statutory damages and actual damages according to proof.

SEVENTH CAUSE OF ACTION

**VIOLATION OF RESPA (12 U.S.C. § 2605)**

(Against Defendant SAXON)

126.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

127.    Section 2605(e)(2) of the Real Estate Settlement Procedures Act  requires lenders to respond to Qualified Written Requests concerning servicing of loans.

128.    On or about June 4, 2010, Plaintiffs' authorized agent sent a Qualified Written Request ("QWR") to SAXON.  The response from SAXON did not comply with the requirements of the Real Estate Procedures Act, including, inter alia, SAXON's failure to address Plaintiffs' request to identify the current holder of the Subject Loan, to provide a accounting throughout the life of the loan, or to produce copies of collection notices and other communications related to the servicing of the loan.

129.    As a result of Defendant's violation of 15 U.S.C. §1639, Plaintiff is entitled to statutory damages and actual damages according to proof.


        Wherefore, Plaintiffs pray for damages as provided by statute.



                        EIGHTH CAUSE OF ACTION

            **UNFAIR BUSINESS PRACTICES (Bus. & Prof. Code 17200 et seq.)**

                        (Against Defendant SAXON)


130.    Plaintiff incorporates herein by reference allegations made in all previous paragraphs as though fully set forth herein.

131.    Defendants have engaged in, and continue to engage in a pattern and practice of conduct that constitute unfair business practices and unfair competition as defined under Section 17200 of the Business and Professions Code, including the following:

        A.  Using false and deceptive statements during loss mitigation efforts to induce

---

homeowners to make payments during trial loan modification period, including misrepresenting the intent to consider or offer modifications in good faith and deceptively representing the true terms and monthly payments under the loan modification during oral communications.

B. Continuing to obfuscate the true beneficiary of the promissory note despite the new statutory requirement for disclosure under 15 U.S.C. §1641(g) and a clear mandate by the current presidential administration to make these sales transactions transparent to consumers.

C. Engaging or utilizing the services of "robo-signers" to execute documents containing false statements as to the identity and authority of the signor, causing recordation in the public land records of such knowingly false documents.

132.   Plaintiff therefore seeks declaratory and injunctive relief necessary to prevent Plaintiff and other Californians from the predatory and fraudulent practices of Defendants designed to cause financial ruin and loss of their home to foreclosure.


PRAYER


WHEREFORE, Plaintiff prays for judgment as follows:

1.      For a temporary restraining order and preliminary injunction to enjoin Defendants from transferring the property.

2.      That the Court cancel the Trustee's Deed Upon Sale.

3.      That the Court Order judgment quieting title in Plaintiffs, establishing Plaintiffs' ownership and possessory interests in the property.

4.      For cancellation of the Deed of Trust and Promissory Note.

5.      For reformation of the loan terms.

6.      For attorney fees and costs of suit.

7.      For general, special, and statutory damages.

8.      For punitive damages.

---

FIRST AMENDED COMPLAINT                                    Page -23-

1    9.    For such other and further relief as the Court may deem proper.

2

3

4

5

6    DATED:  October 31, 2011

7

8         Law Office of Chris Gardas

9

         _____/s/ Chris Gardas_____
10       By:    Chris Gardas
         Attorney for Plaintiffs
11       Edgardo Michel and Alis Salinas de Michel

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                        Verification

FIRST AMENDED COMPLAINT                          Page -24-

1

2   We, EDGARDO MICHEL and ALIS SALINAS DE MICHEL, are the Plaintiffs in the

3 above-entitled matter.  We have read the foregoing First Amended Complaint and know the

4 contents thereof.  The same is true of our own knowledge, except as to those matters which are

5 herein alleged on information and belief, and as to those matters, we believe them to be true.

6   We declare under penalty of perjury under the laws of the State of California that the

7 foregoing is true and correct.

8   Executed this the 31st day of October, 2011 in Salida, California.

9

10   /s/ Edgardo Michel
   EDGARDO MICHEL
11   Plaintiff

12

13   /s/ Alis Salinas Michel
  ALIS SALINAS MICHEL
14   Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT        Page -25-